# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **ALLEN LEE GODFREY, SR.,** | ) | **CASE NO. 7:14CV00476** |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **COLONEL BOBBY D. RUSSELL,** *ET AL.,* | ) | **By: Norman K. Moon** |
| | ) | **United States District Judge** |
| **Defendants.** | ) | |

Allen Lee Godfrey, Sr., a Virginia inmate proceeding *pro se*, filed this civil rights action pursuant to 42 U.S.C. §§ 1983 against various officials and medical personnel at the Western Virginia Regional Jail ("WVRJ").[1] Godfrey alleges that the defendants violated his constitutional rights in various ways, among other things, by denying him adequate medical and mental health care and failing to protect him against an assault by another inmate in which Godfrey was blinded in one eye. Upon review of the record, I conclude that the defendants' dispositive motions must be granted.

---

[1] Godfrey names the following individuals as defendants: Nurse John Doe Ratliff, Uzma Ali, MD, Heather Stevens, Physician Assistant ("PA"), Megan Barefield, HSA, Ashley Rakes, RN, and Stephanie Warf, MHC (collectively "the medical defendants"); and Colonel Bobby Russell, Major Gregory Winston, Major Amanda Tuck, Captain C.A. Keller, Captain Robert Altizer, Sergeant Rachel Wylie (misspelled Wiley in the complaint and the court's docket), Officer Janet Norwood-Smith, Officer Kevin Mahl, Officer Robert Henderson, Officer Stewart Edwards, Officer Trevor Bratton, Major Joshua Salmon, Sergeant Daniel Linkous, and Officer Leftwhich ("the nonmedical defendants").

# I. BACKGROUND [2]

Godfrey was arrested on December 31, 2011, in Roanoke, Virginia, for assault and battery of a police officer and charges related to that incident. During the criminal proceedings on these charges, he was detained in the Roanoke City Jail. After his conviction and sentencing, authorities transferred Godfrey to WVRJ in Salem, Virginia. Classification officer Wylie assigned Godfrey to 4A pod, a general population unit for minimum to medium security inmates. Shortly after his arrival at WVRJ, on April 14, 2013, Godfrey had a verbal altercation with an inmate named Burnette. Both inmates were moved to administrative segregation [3] and received disciplinary charges for threatening another person with bodily harm. After a disciplinary hearing, classification officers Norwood-Smith and Mahl found Godfrey guilty and imposed a penalty of five days in punitive segregation, a status in which he could not earn good conduct time. Godfrey told Norwood-Smith and Mahl that the problem with Burnette, a member of the Bloods gang, stemmed from Godfrey's son having been part of the Crips, a rival gang. Godfrey told the officers that, ordinarily, he could get along with anybody. Norwood-Smith told him to remember that when he received his next cell mate. In light of this incident, along with

---

[2] The direct evidence about what happened in this case is difficult to corral in the extensive record, but it is, for the most part, undisputed. Godfrey's complaint itself is broad brush, with particular details (such as dates) often omitted, and the chronology of his stories is not always clear. Godfrey apparently intends for the court and the defendants to find such details among the many documents he attaches to the complaint. In addition, he has responded to defendants' dispositive motions with multiple, verified responses and extensive additional documentation from his medical records, disciplinary proceedings, grievances, and court cases.

Taking a firm grasp on my obligation to construe liberally a *pro se* litigant's pleadings, I have reviewed the lot, including the 999 pages of documents produced to Godfrey in discovery, which he incorporates into one of his many responses. I provide here a summary of events related to Godfrey's claims, based on his allegations and the records he has submitted that are consistent with them. These facts I consider in the light most favorable for Godfrey, for summary judgment purposes. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Godfrey's speculative and conclusory assertions about these events, however, are not factual matter and, thus, are not included in this summary, except where noted as allegations only.

[3] While still in the Roanoke jail, Godfrey filed a civil rights action against the Roanoke City police officers involved in his arrest. Godfrey "felt" that while Officers Henderson and Edwards were going through his property for his move from 4A pod to administrative segregation, they had taken items from his legal paperwork that they later discussed with other WVRJ officers, many of whom were former Roanoke City police officers. Godfrey also believed Henderson and Edwards destroyed his radio and headphones during this property move.

2

Godfrey's criminal record and recent convictions, officers classified him as a low risk, maximum security inmate ("low max").

Back in 4A pod after serving his disciplinary sentence, Godfrey did not feel safe. Inmates were calling him a snitch. His new cellmate and others were known members of the Crips gang. Because Godfrey had helped his son leave the Crips, he believed all Crips were his enemies. He decided to leave that cell block, so when he started having chest pains one day, he went to the medical unit. Nurse John Doe Ratliff allegedly took his blood pressure which was high—167/120. This nurse allegedly did not record this reading, or order an EKG and Godfrey thought Ratliff "acted as if he had something personal against" treating Godfrey. (Compl. 11.) Officer Linkous witnessed this exchange. Godfrey later spoke with a mental health professional ("MHP") about his safety and medical concerns and was placed in medical segregation ("med seg").[4] (Compl. 11.)

On one occasion, when Godfrey complained of pain and "fluttering" in his chest, Nurse Ashley Rakes gave him three EKG tests (with Capt. Altizer present). Godfrey believed one or more of these tests showed that he was suffering from atrial fibrillation. Instead of being transported to an emergency room, as Godfrey believed his situation warranted, he was placed back in a med seg cell over night. He continued to feel fluttering in his chest most of the night,

---

[4] The medical records Godfrey submits regarding these incidents are dated May 3 and May 5, 2013, respectively:

> [Godfrey] states he is having fluttering in chest. [Godfrey] appears anxious and very argument [sic] EKG completed and per PA normal. Instructed [Godfrey] to return to medical as needed.

> [Godfrey] was seen for supportive counseling [and was] requesting to be placed in med seg. Medical refused to authorize placement in med seg. [Godfrey] complaining of medical issues and fearful of his life as he is claiming the [Crips] may cause him harm and has caused his family harm in the past on the street. Lt. Mabry was notified and Capt. on duty authorized [Godfrey] to be placed in med seg.

(Pl.'s Opp'n Summ. J., docket no. 71-5, at 9.)

which he believed was verified by a fourth EKG the next morning. PA Stevens then conducted a fifth EKG, which showed normal results.[5] Later that day, Godfrey felt his heart return to its normal rhythm.

At some point during his stay at WVRJ, Godfrey also underwent a urine test and an abdominal X ray, due to kidney pain and constipation. The X ray verified the constipation. An X ray technician allegedly told Godfrey that two dark spots visible on the X ray might be harmless air pockets, which could be verified with further testing.[6] The medical staff did not order any such testing.

On one undated occasion, Godfrey told an officer Ratliff that he was having chest pains. Ratliff told Godfrey that he had informed Dr. Uzma Ali and PA Stevens about this complaint, but they went to lunch. (Compl. 42.) When the doctor and PA returned, they still refused to check on Godfrey. Moreover, despite Godfrey's several complaints of chest pain, his high blood pressure, and a family history of heart problems,[7] the doctor and PA did not send Godfrey to a heart specialist.

---

[5] Among Godfrey's attachments in support of the complaint is a May 17, 2013, memorandum from Captain Keller, Assistant Services Division Commander, in response to Godfrey's informal grievance about his medical care. Keller stated that based on discussions with medical staff and review of medical records, he found that Godfrey had been provided multiple EKGs at the Roanoke City Jail and at WVRJ, all with "normal results." (Compl., docket no. 1-4, at 6-7.) Keller further stated that the one "bad" EKG result that Godfrey mentioned in his grievance was a malfunction of the machine, and his next EKG presented normal results. (*Id.*) Keller's memorandum also stated that medical staff regularly monitored and treated Godfrey's high blood pressure. In addition, all the medical notes Godfrey offers in support of his complaint about EKG tests performed on him indicate normal results.

[6] Godfrey attaches a grievance response to his complaint, stating: "The X-ray you mention was read by a radiologist who cleared the results and did not mention any abnormalities showing in your lungs. (Compl., docket no. 1-4, at 8.)

[7] Godfrey alleges that his twin brother had recently passed away at age 36. The medical records also indicate that Godfrey complained of chest pains on two occasions in June 2013, in addition to the incidents in early May. (Pl's Opp'n Summ. J. docket no. 71-5, at 9.)

4

On May 6, 2013, Godfrey refused orders to move from med seg to a general population cell block.[8] He asked to remain in med seg or to be placed in some other custody status where he could earn good conduct time without being exposed to other inmates or officers he distrusted. Classification officer Norwood-Smith refused, stating that Godfrey's medical and mental health concerns did not qualify for these other custody statuses.[9] Instead, Norwood-Smith placed Godfrey in punitive segregation status, which deprived him of the ability to earn good conduct time, although he remained confined in med seg. Godfrey filed a written request to see classification officer Wylie about his concerns, but she answered that she did not "make house calls" and took no steps to change Godfrey's classification. (Compl. 14-15.) Godfrey also allegedly filed numerous grievances (known as "blue slips") on these matters, but never saw many of them again. At least one of Godfrey's written complaints about these matters reached WVRJ superintendant Bobby Russell, who asked mental health coordinator Stephanie Warf to investigate. (docket no. 89, WVRJ-000171-74.)[10]

At Russell's request, Warf emailed the superintendant a compilation of notes that mental health professionals ("MHP") had taken regarding consultations with Godfrey in May 2013. On May 5, 2013, Godfrey said he wanted to be in med seg because members of the Crips gang (which had previously threatened his family harm) had entered his former pod; the MHP noted that the only mental health concern Godfrey reported that day was "feeling threatened by other

---

[8] Godfrey alleges that Norwood-Smith attempted to place Godfrey in block 3A, but he refused because it was next door to block 4A, where some of the Crips gang members were, and inmates in the two blocks could talk through the connecting door. Norwood-Smith also allegedly attempted to place Godfrey in block 1E, a maximum security pod, but Godfrey refused, because Officer Edwards was working in that area.

[9] Godfrey also asked to be transferred to another jail or to be "expedited to" the Virginia Department of Corrections ("VDOC"). The jail handbook indicates that VDOC officials determine when an inmate may move from a local jail to a VDOC facility.

[10] The pages of discovery materials provided to Godfrey and submitted to the court as part of docket no. 89 are chronologically numbered in the lower right corner, starting with "WVRJ-000001." Godfrey's reliance on many of these documents implicitly incorporates them by reference as verification of allegations in his complaint.

5

inmates." (*Id.*) On May 16, 2013, an MHP talked to Godfrey to determine if mental health issues justified his remaining in med seg. She noted Godfrey's report that he distrusted jail officers because of his lawsuit against Roanoke City officers, that he was dissatisfied with his medical care, and that he feared he would "go off on someone" if returned to general population. (*Id.*) The MHP reminded Godfrey of his responsibility to control his own actions and reactions to others, but found that Godfrey "did not appear to be truly paranoid at this time." (*Id.*) The MHP found that Godfrey did not meet criteria for a mental health hold in med seg.

Warf herself spoke with Godfrey on several occasions. On May 21, 2013, Godfrey told her that he wanted to stay in med seg because he was afraid other inmates ("gossip girls") would share his private information with others, that he would get into fights in general population, or that people might "try to jump him." (Pl.'s Opp'n. Mot. Summ. J., docket no. 71-5, at 7.) Warf allegedly told Godfrey, "I think you can handle it," and "reminded" Godfrey of an Officer Amos's statement that "if [Godfrey] were attacked [he] had a right to defend [himself] without getting into trouble for it/self defense." (Compl. 20.) When Godfrey repeated his desire to avoid fights and assaults in population, Warf repeated her finding of no mental health reason for Godfrey to be assigned to med seg. Godfrey states that Warf's statements and the threat of continued punitive segregation and inability to earn good time "coaxed [him] under a coerced duress/forced [him] basically back into population." (Compl. 21.) Warf told Godfrey that although she found no mental health reason to hold him in med seg long-term, she would advise the classification officers of his concerns about being transferred back to population.[11]

---

[11] Documents Godfrey incorporates into his complaint indicate that Warf advised classification officers about Godfrey's fears of getting into fights in population, but noted that Warf found no medical or mental health reason for Godfrey to remain in med seg.

After receiving Warf's email about the mental health staff's assessment of Godfrey, Russell replied to Godfrey's blue slip on May 28, 2013, stating that his concerns were "being dealt with." (Compl. 15.) Major Amanda Tuck later spoke with Godfrey in med seg about his concerns and told him that he could not file grievances about classification decisions.[12] Eventually, in late May 2013, Godfrey obeyed an order to move from med seg to 2E pod, a low-max security, general population unit.

Godfrey "immediately felt uneasy" in block 2E, in part, because officers Henderson and Edwards both worked there, and he believed they had taken some of his property back in 4A pod. (Compl. 23.) Godfrey's "intuition was telling [him] that something just wasn't right and that something bad was going to happen to [him]" in 2E pod. (Compl. 23.) These feelings increased after inmate Chad Hylton approached Godfrey in the common area and told him that "he would take anything from anybody [because] he was in fact a proud predator [and] what he [ ]does was prey on others." (Compl 23.) Godfrey states that he was unaware then of some 2E inmates who "were plotting to attack and sexually assault" Godfrey and "beat/tie up and/or choke" him with a rope they had made. (Compl. 23.) An inmate in a nearby cell told Godfrey someone had made shanks out of a wooden Scrabble tile holder. Another inmate said "they wanted to F***" Godfrey, and he overheard comments about "getting someone" in the shower. (Compl. 24.) Godfrey began locking himself in his cell during the day and filed blue slips asking to be reclassified to med seg or protective custody due to his "feelings (paranoia) and intuition," but the blue slips "went unanswered." (Compl. 25.) Godfrey believes officer Linkous and other

---

[12] Godfrey asserts that Tuck's decision to disallow classification grievances was biased, because of her personal friendship with classification officer Smith. The WVRJ handbook attached to Godfrey's complaint indicates, however, that the jail's grievance procedure covers inmate complaints about jail problems and "questions NOT involved in disciplinary action or increased custody" (Compl. Attach., docket no. 1-3, at 59) (emphasis in original). Such decisions, made by the Adjustment Committee and the institutional Classification Committee have a separate appeal procedure and thus "do not fall within the purview of the grievance procedure." (*Id.*)

defendants destroyed these blue slips. (Compl. 36-37.) Godfrey's custody status remained unchanged, and he remained in 2E pod.

After a while, other inmates "coaxed" Godfrey out of his cell by saying that they had only been "messing around/playing." (Compl. 25.) A girlfriend's nephew, who happened to be in block 2E, said he had Godfrey's back.[13] So, Godfrey started to leave his cell again. One night Hylton and an inmate Vasquez threw a dice hard at Godfrey and hit him in the back. Godfrey also continued to hear rumors about weapons and sexual assaults and did not like the way inmates, especially Hylton and Vasquez, looked at him. His uneasiness worsened.

About 10:30 p.m. on the evening of July 2, 2013, Godfrey went into his cell alone and locked the door. He did not have a cell mate at that time. Through the air vents, he could hear inmates Hylton, Vasquez, Barret, Bryant, and Jordan talking in the next cell, where Hylton was tattooing someone.[14] First Vasquez, then Barret, and later Jordan came to Godfrey's cell door and peeked in the window. Godfrey called out and confronted these inmates through the air vents about their peeking into his cell and "planning to attack and sexually assault" him. (Compl. 28.) Jordan came to Godfrey's window and said they were only playing, but Hylton grew enraged. He went upstairs to his cell and back, yelling, "Are you talking to me[?] I'm going to put my shoes on." (Compl. 28.) Hylton then began beating on Godfrey's cell door window, shouting for someone to "open this fucking door." (Compl. 28.)

With no call buttons in the cells, Godfrey had no way to warn the control booth officer that he did not want his door unlocked or that he needed help. Hylton was taller and heavier than Godfrey. Godfrey feared that if he did nothing, Hylton and perhaps other inmates would charge

---

[13] Godfrey also heard that Hylton would soon be leaving the pod, as he was awaiting extradition on murder charges pending against him in West Virginia.

[14] Godfrey states that the 2E pod officers knew of and allowed inmates to tattoo each other, although WVRJ policy prohibits this practice.

8

into his cell to attack him out of view of the control booth officer and the pod's security cameras. Godfrey felt he had to get out into the common area in view of the cameras and the officers, who could come to help him. He felt that "either way violence was inevitable" and that he had to defend himself. (Compl. 29.)

Godfrey alleges that Defendant Bratton, the officer in the control booth that day, "knew of Godfrey's concerns and paranoia about being in the 2E max pod and [his] attempts to get reclassified/moved." (Compl. 1-2.) When Vasquez asked to have Godfrey's cell door opened, Bratton remotely "buzzed/popped" that door unlocked. (Compl. 28.) An instant later, Godfrey rushed out of his cell and pushed Hylton against a wall.

Godfrey intended only to hold Hylton until officers could come to his aid. He could see Edwards and another officer at the door to the cell block, but they did not rush to help him. Meanwhile, Godfrey saw inmates Vasquez and Bryant approaching and saw Hylton give a nod. Then, Godfrey was "knocked unconscious to [his] knees" and woke up to feel something pushing into his right eye, which started to bleed. (Compl. 32.) He jumped up and heard Hylton say, "Now look at you, Dog, you['re] blind. If you come at me again I'll take your other eye out." (Compl. 32.) Godfrey could see Officer Edwards and other officers entering the cell block at this point. Nevertheless, upset at the eye injury, Godfrey charged at Hylton again, missed, and ran into the wall instead. Hylton said to the officers, "I was tired of him talking to me like I was a kid." (Compl. 33.)

Officers separated Hylton and Godfrey. Seeing that Godfrey was injured, they escorted him directly to the medical unit, where they took pictures of his injuries. He was later transported to the emergency room. During the altercation, Godfrey sustained a complete loss of vision in his right eye and other injuries. According to state court records available online,

9

Hylton was charged and stood trial in the Roanoke County Circuit Court on a felony count of aggravated malicious wounding. According to Godfrey, other inmates who had been present in 2E pod testified, and the judge found Hylton not guilty. An assault and battery charge against Godfrey was dismissed.

Godfrey filed this § 1983 complaint in September 2014.[15] The medical defendants have filed motions to dismiss.[16] The nonmedical defendants have filed a motion for summary judgment, supported by affidavits and video footage, as to Godfrey's claims of deliberate indifference to his safety and a motion to dismiss as to all other claims. Godfrey has responded fully to these motions after extensive discovery, and I now find them ripe for disposition.

## II. DISCUSSION

### A. Standards of Review

A motion to dismiss tests the legal sufficiency of a complaint. *See, e.g., Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553-63 (2007). A complaint needs a short and plain statement of the claim showing that the pleader is entitled to relief and sufficient "[f]actual allegations . . . to raise a right to relief above the speculative level . . . ."; a factual basis for relief "requires more than labels and conclusions . . . ." *Id.* at 555 (internal quotation marks omitted). Therefore, the plaintiff must "allege facts sufficient to state all the elements of [the] claim." *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003).

Section 1983 permits an aggrieved party to file a civil action against a person for actions taken under color of state law that violated his rights under the Constitution or laws of the United

---

[15] Godfrey is no longer housed at WVRJ. He was released in July 2013 and is currently confined at Deep Meadow Correctional Center.

[16] Nurse John Doe Ratliff has not been served. Defendants state that no nurse by that name worked at WVRJ when Godfrey was there. Nevertheless, counsel for defendants has entered a special appearance on behalf of this defendant and filed a motion to dismiss on his behalf.

10

States.  *See Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013).  To state a claim under this statute, a plaintiff must establish that he has been deprived of constitutional rights through the actions of a person or persons acting under color of state law.  Therefore, he must affirmatively state conduct or omissions by each of the named defendants, personally, that violated his federally protected rights.  *See e.g., Garraghty v. Va. Dep't of Corr.*, 52 F.3d 1274, 1280 (4th Cir. 1995); *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985).

A court should grant summary judgment "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphasis added).  When a motion for summary judgment is made and properly supported by affidavits or other documentation, the non-moving party may not rest on the mere allegations or denials of the pleadings.  Rule 56(e).  Instead, the non-moving party must respond by affidavits or otherwise and present specific facts from which a jury could reasonably find for either side.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).  "As to *materiality* . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* at 248.  A factual dispute must also be "*genuine,* [meaning that] the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* (emphasis added).

In reviewing the evidence, the court must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence."  *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004); *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (observing in excessive force case that inmate was to "have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him" (citation omitted)).  Detailed factual allegations

in a verified, *pro se* complaint may be sufficient to withstand a motion for summary judgment with supporting affidavits containing a conflicting version of the facts. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) ("[A] verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge.") (citing *Davis v. Zahradnick*, 600 F.2d 458, 460 (4th Cir. 1979)). The nonmoving party cannot defeat a properly supported motion for summary judgment, however, with mere conjecture and speculation. *Glover v. Oppleman*, 178 F. Supp. 2d 622, 631 (W.D. Va. 2001) ("Mere speculation by the non-movant cannot create a genuine issue of material fact.").

### B. The Medical Defendants: Motion to Dismiss

Deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment and is actionable under § 1983. *See Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). A serious medical need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir.2008) (internal quotation marks omitted). "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (*overruled on other grounds by Farmer v. Brennan*, 511 U.S. 825 (1994)).

An official is "deliberately indifferent" only if he was personally aware of facts indicating a "excessive risk to an inmate's health or safety," actually recognized the existence of such risk, and disregarded or responded unreasonably to that risk. *Farmer*, 511 U.S. at 837. "[A]n inadvertent failure to provide adequate medical care" does not amount to the deliberate

indifference required to prove a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105-06. Similarly, the deliberate indifference standard "is not satisfied by . . . mere disagreement concerning '[q]uestions of medical judgment.'" *Germain v. Shearin*, 531 F. App'x 392, 395 (4th Cir. 2013) (citing *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975)).

As an initial matter, Godfrey concedes that he has no actionable claim against Nurse Barefield. Therefore, I will grant the motion to dismiss as to this defendant.

As to the other medical defendants, Godfrey asserts that on some occasions, they did not provide the medical attention that Godfrey believed appropriate for his symptoms. I cannot find that the events presented in Godfrey's submissions state all the necessary elements of a plausible claim that any of the medical defendants acted with deliberate indifference to his serious medical needs.[17]

First, Godfrey contends that when he complained to Nurse John Doe Ratliffe of chest pains, the nurse should have sent him to the emergency room or performed an EKG. He alleges that instead, she left him in his med seg cell in pain and fearing that he would die. Godfrey states that Ratliff likely did not follow the protocol for such situations as set forth by Conmed, the jail's medical provider. Godfrey also asserts that he might have suffered a stroke or a heart attack or other damage to his heart unknown to him even now. These speculative generalizations about possible harms are simply not sufficient to support a reasonable inference that Ratliff knew Godfrey's symptoms presented a medical need so obviously serious as to mandate a doctor's immediate attention. Moreover, Godfrey admits that shortly after his encounter with Ratliff, he

---

[17] Godfrey submits an affidavit from an inmate Fink, who expresses dissatisfaction with medical care he received at WVRJ. Fink's experiences have no bearing on the elements of Godfrey's claim that he had serious medical needs to which the defendants were deliberately indifferent. Moreover, Godfrey cannot pursue any claim for relief on Fink's behalf for the alleged mishandling of Fink's medical problems. *See, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563 (1992) (noting that a plaintiff must have personally suffered an injury before he can bring a lawsuit); *Hummer v. Dalton*, 657 F.2d 621, 625- 626 (4th Cir.1981) (holding prisoner's civil rights action was "confined to redress for violation of his own personal rights and [was] not one by him as a knight errant" for other inmates).

13

was placed in med seg and received an EKG and examination by the PA. Thus, at the most, Ratliff's alleged inaction delayed treatment for Godfrey's complaints of chest pain and high blood pressure. An official's intentional act or omission that merely delays an inmate's access to necessary medical care may state a constitutional claim, but only if plaintiff shows that the defendant's conduct resulted in substantial harm to the patient. *Webb v. Hamidullah*, 281 F. App'x 159, 166 (4th Cir. 2008) (citing other cases). Godfrey's submissions make no such showing. Accordingly, I will grant the motion to dismiss his claims against Ratliff.[18]

Godfrey next asserts that Nurse Rakes and PA Stevens rejected and threw away some abnormal EKG results and then manipulated the electrodes to make a final EKG reach normal results. He also contends that these defendants should have sent him to the emergency room after the abnormal results and reacted more quickly to his complaints of chest pain. He insists that in light of his history and symptoms, the PA and/or Dr. Ali also should have arranged for him to see a heart specialist. Similarly, he faults them for not ordering unspecified tests to ensure that dark spots on his abdominal X ray did not depict some life-threatening condition. Finally, Godfrey asserts that based on one or more of his medical complaints, the medical staff should have approved him to stay in med seg so that he could earn good conduct time.

Clearly, Godfrey disagrees with the defendants' professional decisions—their interpretations of his EKG and X ray results and their decisions to monitor him in med seg only temporarily, rather than holding him there long term or seeking emergency or other specialized care or testing. Godfrey's mere disagreement with these medical judgments, however, is not

---

[18] Godfrey's allegations that Ratliff and the other medical defendants failed to follow protocol or normal nursing examination procedures arise, if at all, under state regulatory or medical malpractice law. Section 1983 was intended to protect only federal rights guaranteed by federal law. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985). Godfrey's state law claims are thus not independently actionable under § 1983, and I decline to exercise supplemental jurisdiction over them in this action. *See* 28 U.S.C. § 1367(c). I will dismiss all such claims without prejudice.

14

sufficient to support a plausible inference of deliberate indifference. Godfrey's contentions are essentially accusations that defendants' examination and treatment decisions were negligent, and negligent conduct is not actionable under § 1983. *See Estelle*, 429 U.S. at 105-06 (finding that alleged "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner").

Moreover, the records that Godfrey incorporates by reference into his complaint clearly indicate that the WVRJ medical staff provided extensive evaluation and treatment of his chest pain and blood pressure issues. These records also do not reflect that any doctor ever diagnosed Godfrey as having suffered any heart damage as a result of the treatment he received (or did not receive) while at WVRJ.[19] Godfrey's speculative worries about possible long-term heart damage or undiscovered lung tumors, without any facts in support, are not sufficient to state a plausible claim that he suffered from any serious medical need for different treatment while at WVRJ. Accordingly, I will grant the motion to dismiss on behalf of Nurse Rakes, PA Stevens, and Dr. Ali concerning Godfrey's claims about his heart issues and his desire for X ray follow up and long-term med seg approval.

Under the Eighth Amendment, a prisoner is entitled to necessary psychiatric treatment, reasonable in cost and time, if a health care provider makes a professional assessment "(1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir.

---

[19] The alleged decision by the doctor and the PA to go to lunch after Godfrey's reports of chest pains constitutes, at the most, a delay of treatment or a decision that previously provided treatment was sufficient. Because Godfrey does not state facts showing that this delay caused any significant harm, the defendants are entitled to have the claim dismissed. *Webb*, 281 F. App'x at 166.

15

1977). The plaintiff must show that the psychiatric treatment denied to him was a medical necessity, rather than merely what he, himself, found desirable. *Id.* at 48.

Godfrey's claim against Warf, the mental health coordinator for WVRJ, is that allegedly she knew Godfrey's mental health issues put him at a substantial risk of harm in a general population pod, in particular a low-max pod like 2E. He alleges that despite this known risk and her authority to issue a mental health hold to keep him safe in med seg on a long-term basis, Warf coaxed him to agree to the move into 2E pod. Yet, other than his speculative fears about what he might do or what might happen to him in a general population pod, Godfrey does not identify any mental health illness or condition that warranted his long-term assignment to med seg. Moreover, his own allegations and evidence clearly indicate that in her professional judgment, Warf found no mental health basis for the med seg hold that Godfrey desired. In fact, she believed that assigning Godfrey to med seg would merely reward his manipulative attempts to obtain the housing assignment he wanted—through false claims of medical or mental health needs that did not justify it. Godfrey's evidence does not support a plausible claim that Warf knew of a serious mental health need for him to remain in med seg. His disagreement with her professional judgment on his mental health needs states, at most, a claim of negligence, which is not actionable under § 1983.

Furthermore, Godfrey's allegations and evidence do not support a plausible claim that Warf knew her actions would place Godfrey at a substantial risk of harm. Warf noted her understanding that Godfrey's dislike of inmates' gossiping about him, rather than his safety, was the true basis for his seeking a med seg assignment. Godfrey characterizes this conversation as Warf's "coaxing" him into general population, thus verifying that he made the choice, however difficult, to leave med

16

seg to earn good time.[20]   Moreover, Warf relayed to the superintendant and the classification officers Godfrey's fears about fighting in general population.   As she told Godfrey repeatedly, however, absent a medical or mental health reason for a med seg hold, jail policy required classification officers, not mental health staff, to determine Godfrey's cell assignment.   Taking Godfrey's allegations and supporting submissions about Warf as true, I cannot find that he has stated any § 1983 claim against her, and will grant her motion to dismiss.

## C.  The Nonmedical Defendants:  Motion to Dismiss

### 1.  WVRJ and medical/mental health care providers

These defendants first move for dismissal of Godfrey's claims against WVRJ itself.  The caption of Godfrey's complaint listed as defendants WVRJ, "Conmed WVRJ-medical provider," and "WVRJ-mental health provider."  (Compl. 1.)  Due to an inadvertent docketing error, these defendants were not added to the court's docket.  Thus, when the clerk's office mailed notice of waiver of service paperwork to the individual jail employees listed as defendants on the fourth page of the complaint, no waiver was addressed to WVRJ or its medical or mental health providers.  In later submissions, Godfrey has renewed his intention to pursue claims against these entities.  Accordingly, I will direct the clerk to add them to the docket.

I must then grant the motion to dismiss Godfrey's claims against WVRJ, however.  The jail itself does not qualify as a "person" subject to suit under § 1983.  *See McCoy v. Chesapeake Corr. Ctr*, 788 F. Supp. 890, 893-94 (E.D. Va. 1992).

For a different reason, I will summarily dismiss Godfrey's claims against Conmed and the jail's mental health provider.  These entities, even assuming they qualify as persons subject to suit under § 1983, could only be liable if Godfrey's allegations stated a viable claim that their

---

[20]   Godfrey also faults Warf for leading him to believe that if he fought back against an inmate who attacked him, he would not "get in trouble."  Even if true, this fact has no bearing on my decision that Godfrey's allegations do not support a claim that Warf knew her actions placed him at any substantial risk of serious harm.

17

employees violated his constitutional rights pursuant to employer policies. For reasons already stated, I have concluded that Godrey's allegations do not state any § 1983 claim against the individual medical and mental health providers sued in this case. Therefore, pursuant to 28 U.S.C. § 1915A(b)(1),[21] I will summarily dismiss all claims against the defendants that Godfrey identifies as "Conmed WVRJ-medical provider" and "WVRJ-mental health provider."

### 2. Interference with or denial of medical care

Godfrey alleges that Altizer and Linkous were present and did not intervene when one or more of the medical defendants saw Godfrey for a medical complaint and allegedly did not provide appropriate care. In later submissions, Godfrey alleges vaguely that Keller and other nonmedical defendants were "involved" in or knew from blue slips or grievances about Godfrey's belief that he had been denied care for "serious emergency medical needs." (*See, e.g.,* Pl.'s Opp'n 3, docket no. 69.)

These officials, however, could rightfully rely on the expertise of the jail's medical staff personnel to evaluate Godfrey's medical conditions and symptoms and determine what appropriate treatment, if any, those conditions warranted. *See Miltier*, 896 F.2d at 854. Godfrey does not allege that Altizer, Keller, Linkous, or any other nonmedical defendant interfered with the medical defendants' treatment decisions or efforts at any time while he was at the jail. On the contrary, the record is replete with evidence that supervisory officials, such as Keller and Russell, as well as the classification officers, inquired about Godfrey's health complaints to ensure that any medical need for segregation was considered and addressed, according to the medical judgment of his medical and mental health providers. *See id.* at 854-55. Accordingly,

---

[21] A complaint filed by an inmate challenging the conduct of an "officer or employee of a governmental entity" may be dismissed under § 1915A(b)(1) if the complaint is "frivolous, malicious or fails to state a claim upon which relief may be granted."

Godfrey has not shown that the nonmedical defendants were deliberately indifferent, and I will grant their motion to dismiss as to any claim regarding Godfrey's course of medical treatment.[22]

### 3. Unfair treatment because of criminal convictions

Godfrey makes conclusory generalizations that the jail's staff, officers, and superintendent violated his Fourteenth Amendment right to equal treatment by not keeping him safe and not providing equal medical care. He faults Mahl and Norwood-Smith for classifying him to less safe conditions because of his criminal record and his conviction for assault of a local police officer.

The Equal Protection Clause "does not take from the States all power of classification." *Personnel. Admr'r of Mass. v.* Feeney, 442 U.S. 256, 271 (1979). Rather, it keeps governmental decision makers from treating differently persons who are in all relevant respects alike." *Nordlinger v.* Hahn, 505 U.S. 1, 10 (1992). Thus, to succeed on an equal protection claim, a prisoner plaintiff must first "demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *See Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Disparate treatment of similarly situated prisoners "passes muster so long as [it] is 'reasonably related to [any] legitimate penological interests.'" *Veney v. Wyche*, 293 F.3d 726, 732 (4th Cir. 2002) (alteration in original) (quoting *Shaw v. Murphy*, 532 U.S. 223, 225 (2001)). Plaintiff "must plead sufficient facts to satisfy each requirement. *Id.* at 731.

The portion of the WVRJ handbook that Godfrey submits with his complaint clearly states that jail officials use an objective system to classify and assign safe housing to each inmate

---

[22] In one of Godfrey's responses, he asks to amend his complaint to add Capt. Atkins and Lt. Mabry as defendants, because medical records indicate that an MHP communicated to these officers Godfrey's concerns that his medical care was inadequate. Based on my conclusions herein, Godfrey's requested amendment is futile. Therefore, I decline to construe or consider Godfrey's request as a motion.

based primarily on his "current charge(s) and convictions; . . . criminal history; and [p]ast institutional behavior." (Compl. Attach., docket no. 1-3, at 13-14.) The handbook also indicates that classification officers will interview each inmate about other personal safety issues, such as enemies, and consider all these factors to balance his security needs and the general security needs of the jail as a whole. Godfrey states no facts in the complaint or other submissions to support a plausible claim that jail staff or medical personnel treated him differently, at any time, from other jail inmates with similar criminal and disciplinary records and safety concerns. Moreover, consideration of such factors is clearly related to legitimate jail interests in choosing a safe and secure housing assignment for each inmate. Therefore, I will grant the defendants' motion to dismiss as to Godfrey's equal protection claims.

### 4. Due process: good conduct time

Godfrey alleges that various jail officials deprived him of good conduct time by placing him in punitive segregation without notice or a hearing, in violation of his due process rights. His own allegations and submissions contradict this generalization, however.

The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Phiphus*, 435 U.S. 247, 259 (1978). "To state a procedural due process violation, a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015).

A prisoner is generally entitled to limited procedural protection before being deprived of earned good conduct time, because such a loss affects the length of his confinement and,

therefore, triggers a constitutionally protected liberty interest. *See gen. Wolff v. McDonnell*, 418 U.S. 539 (1974) (holding that before punishing inmate with loss of earned good conduct time, officials must advance written notice of disciplinary charge, written record of impartial disciplinary committee's findings and evidence on which it convicted him, with a limited right to call witnesses). The evidentiary standard in a disciplinary proceeding is also limited; a reviewing court must uphold the disciplinary board's finding if "there is any evidence in the record that could support the conclusion reached." *Superintendent v. Hill*, 472 U.S. 445, 455 (1985).

Godfrey had notice that the conduct for which he was disciplined at WVRJ violated jail rules. The jail handbook notified Godfrey in its Foreward: "[W]hile you are incarcerated in this jail, you are responsible for compliance to the standards of behavior specified in this handbook. Any [good time] credits or recommendations will be based on your conduct and attitude during your confinement." (Compl. Attach., docket no. 1-3, at 2.) The handbook also lists disciplinary violations, among others "assault (threatening physical harm either verbally or by gesture), battery of any person, or fighting;" and "refusing or failing to obey a direct order." (*Id.* at 47-48.) Both loss of earned good conduct time and punitive segregation (without earning good conduct time) are listed as possible penalties for disciplinary violations, to be imposed after notice and a hearing. (*Id.* at 53.)

Godfrey's allegations and submissions clearly indicate that he also received notice and a hearing on each disciplinary charge. He does not state facts showing that these proceedings failed to provide him all constitutionally mandated protections, as defined in *Wolff* and *Hill*. His admitted conduct of disobeying direct orders to move from med seg to population satisfied the "some evidence" standard in *Hill*. Godfrey's own reasons for committing an infraction have no

21

bearing on the procedural due process analysis. Any complaints Godfrey voices about appeals of his disciplinary convictions or penalties or the officers' classification decisions under WVRJ procedures do not translate into constitutional violations, since these procedures are not constitutionally mandated. *Weller v. Dep't of Social Services*, 901 F.2d 387, 392 (4th Cir. 1990). Such alleged procedural errors or omissions are, at most, violations of state regulations, which are not actionable under § 1983. *See Riccio v. County of Fairfax, Va.*, 907 F.2d 1459, 1469 (4th Cir. 1990).

For the stated reasons, I conclude that Godfrey has not stated any § 1983 due process claim concerning his loss of any good conduct time.[23] I will grant the motion to dismiss as to all such claims and dismiss any related state law claims without prejudice under 28 U.S.C. § 1367(c).

### 5. Due process: grievance procedures

Godfrey also asserts that various defendants deprived him of due process when handling or allegedly mishandling his blue slips, grievances and appeals. He complains that Tuck and Russell did not answer his appeals and that Tuck prevented him from filing a grievance. Godfrey also speculates, with no factual support, that Linkous, Leftwhich, and other defendants may have destroyed or covered up his grievances or blue slips he filed.

---

[23] Godfrey's complaint about not *earning* good conduct time while in punitive segregation does not implicate federal due process procedures under *Wolff*. *See Sandin v. Conner*, 515 U.S. 472, 484 (1995) (holding that prisoner's constitutionally protected liberty interests are limited to "freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life") (citation omitted); *Mills v. Holmes*, __F. Supp.3d__, 2015 WL 1349604, at *9 (E.D. Va. March 24, 2015) (finding that because "VDOC regulations fail to place substantive limitations on official discretion that would give rise to a legitimate claim of entitlement in retaining" a particular good time earning rate, an inmate has no protected liberty interest in his earning rate and "cannot state a claim for denial of procedural due process under the Fourteenth Amendment" related to changes in that rate) (internal quotations and alterations omitted). In any event, as stated, Godfrey's submissions indicate that he received the *Wolff* procedural protections before being placed in punitive segregation status.

These alleged interferences with his meaningful use of the WVRJ grievance procedures do not state any constitutional violation, because inmates have no constitutionally protected right to a grievance procedure. *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). Thus, they have no federally protected right to participation in any particular facet of an existing grievance procedure, *id.*, or to favorable rulings in grievance proceedings. *See Brown v. Va. Dep't Corr.*, No. 6:07-CV-00033, 2009 WL 87459, at *13. (W.D. Va. Jan. 9, 2009) (citing *Adams*, stating that "[r]uling against a prisoner on an administrative complaint does not cause or contribute to [a constitutional] violation"). Based on the foregoing, I will grant the defendants' motion to dismiss as to all Godfrey's complaints concerning grievance procedures.

### 6. Retaliation

Godfrey asserts that Norwood-Smith and Mahl placed him in punitive segregation status to punish or retaliate against him for his complaints about their classification decisions and about his medical and mental health concerns. (Compl. 54.) I find no factual basis for a § 1983 claim here.

Prison officials may not retaliate against an inmate for exercising his constitutional right to access the court. *Hudspeth v. Figgins*, 584 F.2d 1345, 1347 (4th Cir. 1978). On the other hand, to state a § 1983 claim here, Godfrey must present more than conclusory allegations of retaliation. *Adams*, 40 F.3d at 74. He must allege facts showing that his exercise of his constitutional right was a substantial factor motivating the retaliatory action. *See, e.g., Wagner v. Wheeler*, 13 F.3d 86, 90 (4th Cir. 1993) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (requiring plaintiff to show "a causal relationship between the protected expression and the retaliatory action").

Godfrey makes no such showing. Since inmates have no constitutional right to a prison grievance procedure, *Adams*, 40 F.3d at 75, Godfrey was not exercising a constitutional right merely by filing grievances about his medical and mental health care or his classification. Moreover, the record indicates the legitimate and substantial motivating factors behind placing Godfrey in punitive segregation were his convictions for disobeying direct orders. His characterization of the classification officers' decisions as retaliatory is merely conclusory, with no factual basis. For the reasons stated, I will grant the motion to dismiss as to Godfrey's retaliation claims.

### 7. Personal property

Godfrey "feels" that while moving his property after his altercation with inmate Burnette, Officers Edwards and Henderson randomly took his legal documents and destroyed his headphones and radio. Because Godfrey provides no factual basis for this speculation, he fails to state a claim for relief. *Twombly*, 550 U.S. at 555. I will grant the defendants' motion to dismiss as to Godfrey's claim regarding loss of his property.[24]

## D. Nonmedical Defendants: Motion for Summary Judgment

### 1. The defendants' declarations

Wylie, Norwood-Smith, and Mahl describe their classification duties as "a neutral process by which [they] assess risked posed by and to an inmate in order to determine" an appropriate custody level and housing assignment in the WVRJ, according to its policies. (Wylie Decl. ¶ 4, docket no. 63.) The factors considered include "current charge or conviction," criminal record, jail rule violations, "age, employment history, mental and physical health

---

[24]   Moreover, Godfrey has no legal basis for a § 1983 claim based on this alleged deprivation of his property. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984) ("[A]n unauthorized intentional deprivation of property by a state employee does not constitute [a due process violation] if a meaningful postdeprivation remedy for the loss is available."); *Lovelace v. Lee*, 472 F.3d 174, 202 (4th Cir. 2006) (holding negligent deprivations are not actionable under § 1983).

24

concerns, substance abuse history, and gang membership." (*Id.*) WVRJ inmates may "request in writing to be moved from their current pod," but generally may not meet personally with a classification officer about such requests. (*Id.* ¶ 5.)

Godfrey's disciplinary violation in April 2013 related to the altercation with inmate Burnette was a factor in his being classified as "low max" and assigned to 2E pod, which houses other low max inmates. (*Id.* ¶ 9.) These officers state that before Godfrey's fight with Hylton on July 2, 2013 ("the incident"), Godfrey never communicated to them, orally or in writing, that he was "in fear of or had been threatened by inmate Chad Hylton or any other inmate in the 2E pod." (Mahl Decl. ¶ 9; Norwood-Smith Decl. ¶ 14; Wylie Decl. ¶ 12.)

At some point, while in med seg for medical issues, Godfrey told his mental health counselor that he wanted to stay in med seg out of concerns that he would get into a fight if other inmates in the pod started talking about him. When questioned, however, Godfrey "did not identify any particular inmate as having threatened him or caused him to fear for his safety." (Wylie Decl. ¶ 10.) Once the medical issues resolved, officers returned Godfrey to the general population. On May 27, 2013, Godfrey told correctional officer Bratton that he "did not feel right" in 2E pod, that he felt "paranoid" and "did not feel like being around anyone else." (Bratton Decl. ¶ 6.) When Bratton questioned him, however, Godfrey did not say that he was scared for his safety or health and did not identify any particular inmate who had threatened him or caused him to feel as he did. In response, officers placed Godfrey on protective lockdown status him in his cell to keep him separate from other inmates. The next morning, Godfrey said he felt "fine" and wanted to associate with others in the pod again. (*Id.*) WVRJ's classification system "does not permit an inmate to be moved based on vague or generalized statements of anxiety." (Wylie Decl. ¶ 13.)

On the night of July 2, 2013, Capt. Altizer's work shift ended in the afternoon, and he left the jail several hours before the incident in 2E pod. Correctional officer Henderson was working that night in the "Alpha" housing unit, known as A pod, located more than 100 yards down a hallway from the entrance to the "Echo" or E pod; 2E pod, where Godfrey was housed, was one of the four quadrants of E pod. Correctional officers Bratton and Edwards were on duty in 2E pod that night. They state that before the incident that night, they walked through his pod twice every hour to check on inmates; but Godfrey did not approach them or other officers, express any concern for his safety, or request to be removed from 2E pod. He "did not appear to be agitated, angry, scared, or in a negative emotional state." (Edwards Decl. ¶ 7; Bratton Decl. ¶ 7.) None of these officers recalls hearing Godfrey state, at any time, that any inmate or inmates in 2E pod had threatened him or caused him to fear for his safety.

Around 10:46 p.m., Bratton was working in the control room—a centrally located room from which he could see into and monitor the inmates in the common areas of the four quadrants of E pod (1E, 2E, 3E, and 4E). From that room, Bratton had control of individual cell doors and could remotely lock or unlock them. Each pod had a single intercom button, located in the common area near the pod's entrance. By pushing that button, inmates could communicate over the intercom with the control room officer. Without the benefit of the intercom, however, it was difficult for the control booth officer to hear inmates' requests.

Sometime earlier, Godfrey had gone into his individual cell and locked his door by pulling it shut behind him, as inmates commonly did for privacy or to go to bed early. Once locked into his cell, an inmate had no access to an intercom to tell the control booth officer to remotely unlock his cell door. If an inmate locked himself into his cell, but then wanted out, he

would commonly call to another inmate in the common area to ask the control room officer to disengage the lock, so he could open his door again.

At about 10:46 p.m., an inmate in the common area of 2E pod pushed the intercom button and asked Bratton to unlock cell 8, which was Godfrey's cell. Although this request was routine, Bratton states that he stopped another task, stood up, looked into 2E pod's common area, and did not see anything that made him suspicious. He saw Hylton standing several feet in front of Godfrey's door, looking in that direction, but not acting aggressively. When Bratton remotely unlocked Godfrey's cell door, Hylton did not move and the door did not open immediately. Bratton states that all Godfrey had to do if he was afraid of Hylton was to pull his cell door from the inside toward himself a fraction of an inch to reengage the automatic lock. Instead, Godfrey flung his cell door open and charged at Hylton, and the two inmates began fighting. Officer Edwards reported the fight over the radio and asked for assistance. Then Bratton and Edwards ran from the control room to the entrance of 2E pod. There, they waited for other officers to arrive before entering the pod to intervene, according to WVRJ policy, to avoid a potential for being outnumbered and overpowered by other inmates in the area.

Henderson heard Edwards' radio call about a fight in 2E pod. He ran there as fast as he could, on the way passing through at least four doors or gates that must be remotely unlocked. When he arrived in less than a minute at the door into 2E pod, Godfrey and Hylton had already separated.

### 3. The video

In addition to their declarations, the defendants submit a DVD of video footage filmed by the 2E pod surveillance camera between 10 and 11 p.m. on July 2, 2013. Godfrey and the defendants rely on this video as an accurate depiction of events. The video shows Godfrey

sitting alone at a table near other inmates. One of the officers walks right past Godfrey during his rounds. About 10:07, Godfrey walks back to his cell (cell 8) in the corner farthest from the camera and closes the door behind him. Two or three inmates from the tables walk over to a cell near Godfrey's about 10:30 p.m. When the officer makes his 10:30 walk-through, he stops at the door of this cell (which Godfrey refers to as cell 7) for several seconds and appears to be speaking to its occupants before completing his rounds. At 10:38, an officer walks back across the pod and upstairs to speak with an inmate there for a few seconds. Before the officer leaves the pod, one inmate, and then another, walks over to Godfrey's cell door and stands there for a few seconds. The upstairs inmate who spoke with the officer comes downstairs, goes to Godfrey's cell door, and then goes into cell 7. At around 10:41, and again around 10:42, an inmate goes to Godfrey's cell door for several seconds. Inmates go in and out of cell 7 and loiter in front of it. At 10:45 p.m., an inmate in a black shirt leaves cell 7 and goes up the stairs, looking and shaking a finger toward Godfrey's cell as he climbs the steps. A few seconds later, the black-shirted inmate comes back downstairs and walks directly to Godfrey's cell door. He appears agitated and grabs and punches at the door for a few seconds, before standing back a few feet in front of it.

At about10:47 p.m., Godfrey's cell door bursts open and Godfrey runs out, arm outstretched, to push Hylton against the wall. Other inmates come to stand and watch. After less than 15 seconds of punching and struggling, Godfrey falls to the floor, and Hylton walks away from him. Godfrey gets up, and they face off, standing several feet apart, with Godfrey waving his arms. At 10:47:55, the officers enter the pod, Hylton looks toward them, and Godfrey charges him.

### 3. The deliberate indifference standard

As a facet of the Eighth Amendment's prohibition of cruel and unusual punishment, prison officials have a duty "to take reasonable measures" designed "'to protect prisoners from violence at the hands of other prisoners.'" *Makdessi v. Fields*, 789 F.3d 126, 132 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. 833). "Not every injury suffered by a prisoner at the hands of another . . . 'translates into constitutional liability for prison officials responsible for the victim's safety.'" *Id.* at 133 (quoting *Farmer*, 511 U.S. at 834). When an inmate alleges that officials failed to protect him from inmate violence, he must show that (1) he was subjected "to conditions posing a substantial risk of serious harm" and (2) the defendant prison official had a "sufficiently culpable state of mind," namely, "deliberate indifference." *Id.* at 133 (quoting *Farmer*, 511 U.S. at 834). Godfrey's loss of vision in one eye clearly establishes the first prong of this standard.

To qualify as deliberately indifferent, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." *Id.* at 838.

> A prison official's subjective actual knowledge can be proven through circumstantial evidence showing, for example, that the "substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it." *Farmer*, 511 U.S. at 842, 114 S.Ct. 1970 (quotation marks omitted). Direct evidence of actual knowledge is not required. *See id.* at 842-43, 114 S. Ct. 1970.
>
> Accordingly, prison officials may not simply bury their heads in the sand and thereby skirt liability. "[E]ven a guard able to prove that he was in fact oblivious to an obvious injury of sufficient seriousness may not escape liability if it is shown, for example, that he merely refused to verify 'underlying facts that he

strongly suspected to be true,'" or that he "'declined to confirm inferences of risk that he strongly suspected to exist.'" *Brice* [*v. Va. Beach Corr. Ctr.*], 58 F.3d [101,] at 105 [(4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 843 n. 8, 114 S. Ct. 1970). And "it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843, 114 S. Ct. 1970. Nor is it dispositive that the prisoner did not give advance warning of the risk or protest his exposure to the risk. *Id.* at 848-49, 114 S. Ct. 1970.

A prison official remains free to rebut the deliberate indifference charge, even in the face of an obvious risk. "Prison officials charged with deliberate indifference might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id.* at 844, 114 S. Ct. 1970. But absent successful rebuttal, they may be held liable for obvious risks they must have known. *Id.* at 842, 114 S. Ct. 1970.

*Makdessi*, 789 F.3d at 133-34.[25]

Proof that prison officials had the requisite subjective knowledge of an excessive risk of harm to the plaintiff may be evidence of the plaintiff's attempts to seek protection before the assault in question. *Id.* at 134. For example, the plaintiff in *Makdessi* "complained to prison officials, including in the form of numerous written letters and grievances, about physical and sexual abuse he suffered in prison," often with no response. *Id.* at 135.

Prison officials' subjective knowledge may also be proven by evidence of an inmate's inherent vulnerability, even if he did not notify authorities that he feared for his safety in general or at the hands of a particular inmate or group. In *Farmer*, the plaintiff was a young transsexual male with feminine characteristics, who was confined in the general population of a federal penitentiary for men and, within two weeks of arrival, was beaten and raped by another inmate. 511 U.S. at 829-30. The Court remanded the case for factual development as to whether officials

---

[25] The *Makdessi* case concerned an inmate who had previously filed grievances about being raped by prior cell mates, then being celled with a larger, younger gang member who allegedly beat and raped him. 789 F.3d at 129-31.

Case 7:14-cv-00476-NKM-RSB   Document 102   Filed 09/24/15   Page 30 of 39   Pageid#: 2066

were exposed to evidence that the risk of rape to such an inmate was so pervasive and obvious that the defendants must have known of it in time to protect the plaintiff. *Id.*

Finally, prison officials' knowledge of an excessive risk of harm may be proven through evidence showing the officials' exposure to information about the plaintiff's vulnerability in comparison to a specific inmate with whom he was confined. The concurring opinion in *Makdessi* noted the

> contrasts between Makdessi himself (5 feet 4 inches tall, age 49, physically hindered by back problems and asthma, depressed, security level 3, no gang affiliation, two minor prison infractions)" and the prisoner who beat Makdessi, Michael Smith "(a 'Gangster Disciple,' disciplinary record of almost 30 charges, including masturbating and making sexual advances toward a non-offender, numerous aggravated assaults, and fighting with another inmate)."

*Makdessi*, 789 F.3d at 137. The Fourth Circuit held that the trial court should more closely have considered the defendant officials' knowledge of these "significant differences in age, size, health, disciplinary record, and gang affiliation" as presenting obvious risks of serious harm to Makdessi when he was celled with Smith. *Id.* at 136.

Evidence of the officials' exposure to information about the factors that make the plaintiff vulnerable to attack is critical, however. The plaintiff in the *Danser v. Stansberry* case was placed in an unsupervised recreation cage with another inmate previously disciplined for assault in prison, who assaulted Danser because of his convictions for sexual offenses. 772 F.3d 340, 343-44 (4th Cir. 2014). The Fourth Circuit held that Danser failed to prove subjective knowledge of an excessive risk on the part of the officer who placed the inmates together; no evidence indicated that this officer knew Danser was a sex offender or that his job duties required him to check prison data bases containing that information. *Id.* at 348-49. Moreover, in the absence of any excessive risk known or obvious to the officer, his act of leaving the two

inmates in the cage without supervision was a "dereliction of duty," which constituted merely negligence, rather than a violation of Danser's constitutional rights. *Id.* 348.

Finally, the deliberate indifference standard "incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Farmer*, 511 U.S. at 844 (internal quotation marks and citation omitted). Accordingly, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure reasonable safety." *Id.* (internal quotation marks and citation omitted).

### 4. Housing assignment

Godfrey's primary argument against Wylie, Norwood-Smith, and Mahl is that they knew from communications with Warf that Godfrey should stay in med seg to be safe, instead of being placed in 2E pod. His evidence about Warf's discussions with these officers, however, shows a factual basis for these officers' subjective belief that Godfrey had *no* medical or mental health reason to remain in med seg. Warf relayed to these officers her professional belief that despite his fears of getting into fights over things inmates might say about him in a general population unit, Godfrey was capable of controlling his behavior and avoiding fights. There is simply no evidence on which the fact finder could conclude that the classification officers subjectively knew of any substantial risk that Godfrey would try to fight another inmate in 2E pod, thus making him a danger to others or himself. *See, e.g., Strickland v. Halsey*, No. 14-6229,__F. App'x__, 2015 WL 4928270, at *5 (4th Cir. Aug. 19, 2015) (holding that prison official's knowledge of convicted murderer's threats to kill again in prison did not meet subjective prong

of deliberate indifference standard without evidence the official "subjectively believed [the inmate] posed a substantial risk of serious harm to other inmates").

Godfrey also does not identify other facts from which any officers knew that placing him together with the other inmates in 2E pod created a substantial risk of harm. Godfrey vaguely alleges that 2E pod had been the scene of past stabbings and violence, but presents no evidence to support these generalizations, even after receiving nearly 1000 pages of discovery. He also does not identify any personal characteristics, such as age, disability, or appearance, that made him obviously more likely to be vulnerable to violence from other inmates classified to 2E pod, as was the case with the plaintiffs in *Farmer* and *Makdessi*. Godfrey states that Hylton was facing murder charges and was somewhat taller and heavier than Godfrey. Godfrey was not placed in the same cell with this inmate, however, as was the plaintiff in *Makdessi*. Moreover, Godfrey was already convicted of his own assaultive crimes and presents no evidence by which the defendants knew of the murder charges allegedly pending against Hylton in July 2013. While Godfrey feared officers might resent him for his assault of a local police officer, he states no facts known to the defendants, suggesting that Hylton or any other inmates bore ill will and might harm Godfrey because of his crime.

Godfrey alleges, vaguely, that the classification officers, as well as the other defendants, knew from his blue slips, most of which the defendants allegedly lost or destroyed, that he believed he would not be safe in the general population and wanted to be reclassified. As the defendants point out, however, Godfrey does not state in his complaint or other submissions what information he provided on these missing blue slips. Nothing in the record indicates that Godfrey informed any of the defendants, in writing or verbally, about specific inmates or statements, rumors, or events in 2E pod (such as Hylton's "predator" comment or the dice-

33

throwing incident) that caused him to fear for his safety there. Blue slips merely describing Godfrey's uneasy feelings and his desire to be housed in med seg could not put the defendants on notice that he faced a substantial risk of harm being housed in 2E pod instead.

For the reasons stated, there is no material fact in dispute on which Godfrey could persuade the fact finder that Wylie, Norwood-Smith, and Mayl, or any of the other defendants, had subjective knowledge of a substantial risk that Godfrey would be physically harmed if confined in 2E pod. Because Godfrey thus fails to establish this necessary element of deliberate indifference, I will grant summary judgment for the defendants on Godfrey's claims about his housing assignment.

### 5. Opening the door

It is undisputed that before July 2, 2013, Godfrey never informed Edwards or Bratton that he feared for his safety at the hands of Hylton or any other inmate or group in 2E pod or that any 2E pod inmate had threatened to harm him. Godfrey asks the court to find the following as "disputed facts" on which the fact finder could conclude that Bratton and Edwards subjectively knew opening Godfrey's cell door at nearly 11:00 p.m. on July 2, 2013, placed the inmate at a substantial risk of harm. More than a month earlier, Godfrey had told Bratton that he "did not feel right" and felt "paranoid" in 2E pod. Bratton allegedly knew that Godfrey had tried to be reclassified, that Hylton was taller and heavier than Godfrey, and that cell 8 was Godfrey's cell, not Hylton's. The group of inmates in and near Godfrey's closed cell, talking and peeking into his cell, were clearly visible to Bratton in the control booth. Edwards, who was in the common area twice during rounds and spoke to the inmates at cell 7, might have overheard them plotting to attack Godfrey and might have relayed that information to Bratton. Godfrey alleges that after the assault, one of those inmates, Barret, allegedly told him (and would testify) that "they

(Edwards /Bratton?) were going to send him [Barret] in on [Godfrey] as [he] lay in his cell first to attack" him.[26]  (Pl. Decl. 4-5, ECF No. 86.)  Just before opening the door, Hylton was shouting and yanking at, and then pounding, on Godfrey's cell door in a threatening manner. Barret also allegedly told Godfrey, months later when they met again at a VDOC facility, that the WVRJ had changed its practice of allowing an officer to remotely unlock a cell door at the request of a non-resident inmate with no officer present.

Godfrey first asserts that by piecing all this "evidence" together, the fact finder could reasonably conclude that Edwards and Bratton orchestrated or knowingly allowed the entire incident in which he was injured.  He asks permission to communicate with Barret to obtain an affidavit of his expected testimony and wants copies of the jail's current policy on remote cell door locks.  This theory, built entirely on ambiguous comments and conjecture about what the officers *could* have heard or plotted, does not warrant further development and simply cannot survive summary judgment.  Even if Barret would testify as Godfrey predicts, no reasonable fact finder could conclude merely from Barret's equivocal statement about an unspecified "they," and Godfrey's speculations about the video, that these officers plotted with other inmates to allow a physical assault to harm Godfrey in his cell.

Godfrey's alternative theory, based on what the officers *should* have known, also fails under the deliberate indifference standard defined in *Farmer*.  Maybe a careful patrolling officer should have suspected that the group of inmates in cell 7 could be plotting violence, investigated, and ordered them to disband.  Godfrey presents no evidence, however, that Edwards actually suspected from the inmates' actions that danger was afoot and merely failed to investigate.

---

[26]  Godfrey points out that the video footage depicts Edwards speaking to Barret in cell 13 at 10:38 p.m. and Barret then going directly to peer into Godfrey's cell.  Godfrey also alleges in the complaint that immediately after the incident, he overheard Edwards say, "Everything would've been alright/OK if he . . . didn't lose an eye." (Compl. 34.)

35

Maybe a careful control booth officer, even while monitoring all four quadrants of Echo pod from the control room, should have seen inmates ominously congregating and then repeatedly peeking into Godfrey's cell. Perhaps that officer should have reacted to Hylton's yelling threats and making aggressive gestures toward Godfrey's door. Again, Godfrey presents no evidence that Bratton actually observed all that the camera captured or heard any yelling from Hylton at all. It is undisputed that without the use of the intercom, booth officers could not hear well anything being said in the pod. Moreover, Bratton states that when he got the routine intercom call from one inmate to open another's door and focused his attention on 2E pod, Hylton was merely standing and looking at Godfrey's door.

Godfrey contends that, regardless of the other risk factors Bratton might have seen or heard, he should have questioned whether Godfrey (who could have been asleep already) was the one who wanted his door unlocked again so late at night with a bigger inmate waiting outside. Godfrey contends that these facts alone presented such an obvious and excessive risk that harm would come to Godfrey if the door was unlocked, that Bratton and Edwards must have known of the danger. I cannot agree. In not questioning Godfrey before unlocking his door, Bratton was arguably careless or even negligent in the performance of his duties. Such "a merely negligent or careless" performance of his job duties, however, does not equate with the deliberate indifference standard required to prove a constitutional violation, even when the consequences are tragic. *Farmer*, 511 U.S. at 838; *Strickland*, 2015 WL 4928270, at *6.

The constitutional standard requires direct or circumstantial evidence that Edwards and Bratton were not only "exposed to information concerning the risk" that Hylton would injure Godfrey, but also that the risk was so obvious that they "must have known of the risk [*and*] appreciated its seriousness . . . ." *Makdessi*, 789 F.3d at 133; *Id. at* 139 (Motz, J., concurring).

36

On this record, I cannot find that Godfrey has made that showing that Edwards and Bratton had a "sufficiently culpable state of mind," *Farmer*, 511 U.S. at 834, and no reasonable fact finder could either. Therefore, I will grant summary judgment for the defendants on Godfrey's claims that Edwards and Bratton were deliberately indifferent before the assault on July 2, 2013, to an obviously substantial risk that Godfrey would be physically harmed in 2E pod or by any particular inmates in that pod.

Godfrey wants to blame his injuries on the jail's failure to discover and discontinue sooner the practice of remotely unlocking an inmate's cell door at another inmate's behest. There is no evidence whatsoever in the record suggesting that this practice had previously been associated with any inmate-on-inmate attacks. Moreover, Godfrey admits that when Hylton pounded on his door and Bratton unlocked it, Godfrey could have stayed in his cell. He does not contest the video's depiction of Hylton merely standing in front of his door at that point. It is undisputed that if fearful of Hylton, Godfrey could simply have pulled the door inward to reengage the lock, in full view of Bratton, to keep the door between himself and Hylton closed and locked. This action would have prevented Hylton or any other inmate from bursting into the cell to assault Godfrey. Instead, Godfrey chose to burst out of the cell and make the first physical contact between himself and Hylton. Thus, Godfrey's own actions on July 2, 2013, not the door unlocking practice, created the only substantial risk of harm that existed that night.

### 6. Intervention efforts

No party questions whether a known, substantial risk of excessive harm existed once Godfry and Hylton began fighting on July 2, 2013. I find no genuine issue of fact on which the fact finder could hold any of the defendants liable for responding unreasonably to that risk. The uncontested video evidence establishes that no more than 15 seconds elapsed from the time

37

Godfrey charged out of his cell and pushed Hylton against the wall until Hylton's reactive physical assault on him ended with Godfrey on the floor. Edwards and Bratton may have arrived at the door into the common area within that 15-second window. The likelihood that these officers could have reached the fighting inmates at the far end of 2E pod in time to separate them physically before Hylton injured Godfrey's eye, however, is clearly slim, if not impossible. Furthermore, Godfrey does not dispute the defendants' evidence that jail policies forebade them, for safety reasons, from entering the pod to stop a fight without a team of at least three or four officers. Therefore, I conclude that Edwards and Bratton, by immediately calling for assistance and running to the door to await backup before intervening, responded reasonably to the fight and the risks of harm it posed.

I also conclude that no reasonable fact finder could fault the reasonableness of the other defendants' response to Edwards' call for assistance in 2E pod. Undisputed evidence establishes that Captain Altizer was not present at the jail at the time of the incident. Godfrey offers nothing to refute evidence that with the distance and obstacles Henderson had to clear between his A pod work assignment and 2E pod, he arrived only only after Hylton and Godfrey had separated. Finally, the video establishes that the team of at least four officers entered 2E pod within 55 seconds of Godfrey's initial assault on Hylton. By that time, the altercation between the two inmates was concluded, except for Godfrey's second, unsuccessful charge at Hylton after the officers arrived. On this record, Godfrey presents no disputed fact on which he could show that the officers responded unreasonably to the fight or that their response proximately caused the injuries he sustained.

38

For the stated reasons, I will grant the defendants' motion for summary judgment as to Godfrey's claims concerning officers' response to the altercation with Hylton.[27]  Because I conclude that the defendants were not deliberately indifferent to a "substantial risk of serious harm" to Godfrey, they are also entitled to qualified immunity against his claims for damages for the injuries he suffered on July 2, 2013.  *See Pearson v. Callahan*, 555 U.S. 223, 234 (2009).

## IV. CONCLUSION

For the reasons stated, I will grant the medical defendants' motions to dismiss and motions for summary judgment.  The Clerk is directed to send copies of this memorandum opinion and accompanying order to plaintiff and to counsel of record for the defendants.

ENTER:  This __24th__ day of September, 2015.

_____
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

---

[27]  On the last page of his complaint, Godfrey alleges that "the responding officers and *all* other named defendants just stood by watched and later laughed as they *all* watched the incident on video."  (Compl. 56) (emphasis added.)  Clearly, not all the defendants actually responded to 2E pod, and I have concluded that the actual responding officers responded reasonably to the risk the fight posed.  If any of the defendants, at any time, laughed over this unfortunate incident in which Godfrey suffered grievance injuries, disfigurement, and the loss of sight in one eye, such actions were callous and unprofessional.  I find no respect, however, in which such reprehensible actions, if they occurred, deprived Godfrey of constitutional rights.

39